[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14671
Non-Argument Calendar

_____

D.C. Docket No. 1:13-cv-23265-FAM


LAZARA PEREZ,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 27, 2015)

Before JORDAN, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

Lazara Perez appeals summary judgment affirming denial of her application for supplemental security income ("SSI").  We reverse and remand for further proceedings consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On June 24, 2010, Perez filed an application for SSI under Title XVI of the Social Security Act and alleged a disability onset date of January 2, 2005.  Perez maintained she was disabled because of a stroke, difficulty walking, depression, and anxiety.  Her application was denied initially and upon reconsideration.  Through counsel, Perez requested and was granted an administrative hearing before an administrative law judge ("ALJ").

A.    Medical Evidence

1.    Physical Impairments and Assessments

Perez, a resident of Miami-Dade County, Florida, entered the emergency room at Kendall Regional Medical Center on November 23, 2009, with complaints of nausea, vomiting, and dizziness.  A magnetic resonance imaging scan of her brain showed she had suffered a stroke.  She also had high-blood pressure.  When she was discharged on November 26, 2009, Perez was diagnosed with a stroke, hypertensive crisis, and high cholesterol.

On March 2, 2010, Perez returned to the emergency room at Kendall Regional after a doctor's appointment in which she was found to have elevated

blood pressure.  She also reported anxiety and panic attacks.  Her consultation report stated she had malignant hypertension and a history of cerebrovascular accident.  On March 11, 2010, Perez saw Dr. Basilio Garcia-Sellek and complained of constipation and fatigue from her blood-pressure medication.  Dr. Garcia-Sellek diagnosed her with hypertension, status post-stroke, and referred her to a cardiologist.

Perez saw Dr. Rene Hasbun on January 5, February 17, and May 11, 2012, for abdominal pain, nausea, melena (black or tarry stool), heartburn, and difficulty walking.  In January and February, Dr. Hasbun reported Perez had a diminished range of motion, but she had exhibited a full range of motion in May.  Dr. Hasbun diagnosed Perez with abdominal pain, gastro-esophageal reflux disease, and hypertension.  Dr. Hasbun further concluded Perez had a malignancy of multiple myelomas (cancer of plasma cells) and recommended she see an oncologist.

On May 10, 2012, Dr. Hasbun completed a Medical Assessment of Ability to do Work-Related Activities (Physical).  He opined Perez had generalized pain from multiple myelomas and was unable to lift or carry 10 pounds.  Dr. Hasbun concluded Perez was able to (1) sit, stand, or walk for one hour in an eight-hour workday, but not without interruption; (2) occasionally use her hands for simple grasping and fine manipulation; (3) occasionally use her right foot; and (4) frequently use her left foot.  According to Dr. Hasbun, Perez could (1) never

3

climb, balance, stoop, crouch, kneel, crawl, or push and pull; (2) occasionally reach or handle; (3) frequently feel; and (4) continuously hear or speak. Dr. Hasbun noted Perez would be environmentally restricted in all areas, because of an unsteady gait and impaired balance.

The treatment notes of Dr. Fernando Mendez-Villamil, Perez's psychiatrist, provided a description of Perez's psychological symptoms. According to a June 2002 initial Psychiatric Evaluation Form, Perez reported hearing voices and was noted as having paranoid delusions and poor social functioning. Dr. Mendez-Villamil found Perez was calm and cooperative, had good eye contact, and had a coherent and relevant thought process. He diagnosed Perez with major depressive disorder, which was recurrent and severe with psychotic features.

Dr. Mendez-Villamil saw Perez several times between February 11, 2010, and May 1, 2012. In most visits, Dr. Mendez-Villamil noted Perez had a disheveled appearance, retarded psychomotor activity, fair eye contact, a depressed and anxious mood, blunt affect, alert demeanor, poor immediate and recent memory, impaired concentration, thought blocking, and impoverished thought process, but no suicidal or homicidal thoughts or delusions. Additionally, Dr. Mendez-Villamil noted in approximately half the visits Perez reported auditory hallucinations. Perez frequently reported during her visits with Dr. Mendez-Villamil she was depressed; she experienced poor sleep, decreased energy, and

4

motivation; and she was not stable on medications.  Dr. Mendez-Villamil repeatedly diagnosed Perez with major depressive disorder, which was recurrent and severe with psychotic features.

On July 29, 2011, Dr. Mendez-Villamil completed a Medical Assessment of Ability to do Work-Related Activities (Mental) and found Perez had no useful ability to follow work rules; relate to coworkers; deal with the public or with work stress; maintain attention or concentration; understand, remember, and carry out complex or detailed job instructions; maintain her personal appearance; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability.  Dr. Mendez-Villamil determined Perez had a poor ability to interact with supervisors; function independently; and understand, remember, and perform simple job instructions.  Dr. Mendez-Villamil opined Perez's illness had affected her concentration and attention span.  She had "no ability to deal with [the] public because of her instability."  R. at 370.  Dr. Mendez-Villamil further stated Perez's illness had affected her "capacity to remember even simple job instructions," and her social skills in that "she doesn't shower, and gets irritable."  R. at 371.  Dr. Mendez-Villamil concluded Perez was "[u]nable to work at all due to the severity of her illness, poor concentration, [and] poor energy."  R. at 371.

On May 7, 2012, Dr. Mendez-Villamil completed a second Medical Assessment of Ability to do Work-Related Activities (Mental) and found Perez had

5

a poor ability to follow work rules; relate to coworkers; deal with the public and work stress; interact with supervisors; maintain attention or concentration; understand, remember, and carry out complex, detailed, or simple job instructions; maintain her personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. Dr. Mendez-Villamil opined Perez's illness had "affected her concentration and social skills," and she had "lost all ability to deal with any stressors." R. at 386. Dr. Mendez-Villamil further opined Perez's illness had affected her energy, concentration, emotional stability, and reliability. Dr. Mendez-Villamil determined Perez was unable to manage benefits in her own best interest and unable to work, because of her poor concentration, energy level, and decreased ability to deal with stressors.

2.    Consultative Reports and Medical Opinions

On October 9, 2010, consulting psychologist, Dr. Mayra Miro, examined Perez and performed a General Clinical Evaluation with Mental Status Functioning. Dr. Miro observed Perez (1) maintained good eye contact, (2) was well groomed and appropriately dressed, (3) ambulated without gait disturbance or apparent difficulty, (4) had clear and understandable speech, and (5) had an open and straightforward self demeanor but seemed somewhat anxious. Perez reported being completely independent in her self-care, including grooming, dressing, bathing, and eating. She reported, however, loss of desire for social activities.

6

Testing results showed Perez had "consistent difficulties in concentration tasks," but her persistence was adequate. R. at 313. Dr. Miro also noted Perez's thought process was coherent, goal oriented, and organized. Dr. Miro further found Perez "showed clinical symptoms of depression that seemed situational and associated to her difficulties in coping with changes in physical functioning." R. at 313. Dr. Miro opined Perez was "likely to experience limitations in carrying out complex instructions and achieving satisfactory work performance," but her "overall results suggested that [she] ha[d] a good potential for a return-to-work in a suitable type of occupation with appropriate supportive interventions and treatment follow-up." R. at 313. Although Dr. Miro stated Perez appeared to be competent to manage her funds, Dr. Miro also recommended she be supervised in her financial management, given her difficulties in attention and concentration.

In an October 26, 2010, Report of Contact, agency reviewer, Sandra Forbes, reported having a telephone conversation with Perez. In that conversation, Perez reported being completely independent in grooming, dressing, bathing, and eating. Perez cooked dinner for her family most days and drove her ten-year-old daughter to and from school. She oversaw her daughter's homework to ensure her daughter completed it but was limited, because of her difficulties with English.

On November 8, 2010, agency medical consultant, Dr. Catherine Nunez, completed a Mental Residual Functional Capacity ("RFC") Assessment and a

Psychiatric Review Technique.  Dr. Nunez opined Perez was moderately limited in her abilities to (1) understand and remember detailed instructions, (2) carry out detailed instructions, and (3) maintain attention and concentration for extended periods.  Dr. Nunez found Perez not to be significantly limited in any other areas.  She further opined Perez could follow instructions and persist on simple tasks on a regular basis, but she had some limitations associated with both mental and physical impairments affecting her motivation and desire to complete tasks.  Dr. Nunez determined Perez was "socially appropriate and capable of adequate communication with others," but she was best suited to a setting with low social demand.  R. at 326.  Dr. Nunez found Perez "would be able to adapt to the environmental demands of a work-like setting," and her overall functioning was not significantly restricted.  R. at 326.

On February 1, 2011, state agency consultant, Dr. Hector Meruelo, performed a physical examination and noted Perez reported she had had four strokes, suffered from high-blood pressure, and had a heart murmur.  Perez also reported she could bathe, dress, write, eat using a knife and fork, open door knobs and jar lids, and button blouses.  Dr. Meruelo determined Perez had no impairment to dexterity, and her gait was normal.  Perez could (1) get in and out of a chair and on and off the examining table by herself without difficulty and (2) walk on heels and toes.

8

Dr. Meruelo found no edema, cyanosis, trophic changes, varicose veins, or venous insufficiency in Perez's lower extremities. Perez's joints were all normal; there was no evidence of inflammatory or deforming arthritis or arthropathy, motor or sensory deficits, or pathological reflexes. According to Dr. Meruelo, Perez's strength was: arms "5/5"; lower right extremity "4+/5"; and lower left extremity "1+/5." R. at 346. Dr. Meruelo opined: "There could be considerably very mild weakness of the right lower extremity but [this] is not a striking finding." R. at 346. Dr. Meruelo determined Perez's hypertension was well controlled, and she had no other hypertensive complications after her stroke a year prior to the examination. Although Perez complained of some heaviness in her right lower extremity, Dr. Meruelo found "no specific detectable neurological impairment." R. at 346.

On February 14, 2011, state agency reviewer, Marta Sanchez, completed a Physical RFC Assessment. Sanchez opined Perez (1) occasionally could lift or carry up to 20 pounds, (2) frequently could lift or carry up to 10 pounds, (3) could stand, walk, or sit approximately 6 hours in an 8-hour workday, and (4) had an unlimited ability to push and pull. Sanchez determined Perez had no postural, manipulative, visual, communicative, or environmental limitations. Sanchez referenced previous findings Perez did not limp and could walk on her heels and

9

toes.  She also noted Dr. Meruelo's findings that Perez exhibited arm strength of 5/5 and any weakness in her right lower extremity was not striking.

B.    Hearing Testimony and Evidence of Wages

At the June 2012 hearing before the ALJ, Perez testified she had completed high school in Cuba and came to the United States from Cuba in 1980.  Perez testified, at one time, she was able to read, write, speak, and understand English, but she had difficulties doing so after her stroke.  Perez had completed training as a nursing assistant.  Although she had training in the travelling and tourism business, she had not been employed that area.

Regarding work experience, Perez stated she previously had been self-employed as a caretaker for one person.  That job entailed providing breakfast, bathing the person, lifting her, and helping in other ways as needed.  Perez also discussed a prior job as an event worker and explained she had worked different events and performed various tasks, including giving out tickets, helping with different chores, and serving beverages.  She did not lift any weight in that job. Perez had not worked since June 24, 2010, the date on which she filed her SSI application.

Since suffering a stroke in November 2009, Perez testified her right leg and right arm remained somewhat disabled.  She generally could walk about a block before having to stop and sit down.  Thereafter, she could not continue, because of

pain in her right leg.  Perez stated she could stand in a fixed position for 10 to 15 minutes, after which she experienced pain around her waist and downward toward her leg on her right side.  When Perez tried to squat or kneel, her body leaned to one side.  Consequently, she could not lift anything from the ground.

Perez further testified she was right-handed but did not have strength in her right arm.  She could lift a box of tissues and pick up coins but could not lift a gallon of milk.  She previously had cared for her grandson and son, who were about the same age, but she no longer was able to do that, because she could not lift them.

Perez testified she began seeing a psychiatrist, because she lacked the will to do anything, and she felt worthless; since her stroke, her entire life had changed. Perez's children left her medications in a container, indicating when she needed to take them, and Perez took her medications before her children left for work and again in the evening.  She stated she periodically watched television for a short while, but could not concentrate.  Perez was unable to read books and magazines, because she could not understand what she read.  She had no social life and stayed at home with her grandchildren.  Perez's daughters performed the household chores, such as cleaning, and did not allow her to cook because she frequently forgot things.  Perez explained she could drive only short distances, because she suffered from panic attacks and never had driven on the expressway.

Using the Dictionary of Occupational Titles ("DOT"), the vocational expert ("VE"), identified Perez's caretaker job as a personal-care aide, which was a semi-skilled, medium-duty job. The VE could not define Perez's event-worker job under the DOT; based on her testimony, he explained the job was light and unskilled. The ALJ then asked the VE whether a person could perform Perez's past work if she (1) had training in travel and tourism and as a nurse's aide; (2) had a twelfth-grade level of education; (3) could speak Spanish and English but had problems with English; (4) was 47 years old[1]; (5) could perform medium work; and (6) had some psychological problems that might limit her to be off task not more than 5 percent of the time. The VE responded such a person could perform both of Perez's past jobs.

The ALJ asked the VE whether that person could perform Perez's past work, if she was limited to light work. The VE responded such a person could perform Perez's event-worker job. The ALJ then asked what work such a person could do if she was limited to performing only simple, routine, repetitive tasks and could perform medium work. The VE responded such a person could perform the event-worker job and also could (1) work as a hand packer, which was an unskilled job, requiring medium work with 89,000 positions nationally and 4,200 positions in Florida; (2) perform light housecleaning, which was light, unskilled work with

---

[1] Based on Perez's SSI application, she was 49 at the time of the hearing.

12

237,000 jobs nationally and 2,500 in Florida; and (3) work as a small-parts assembler, which was light, unskilled work with 235,000 jobs nationally and 1,500 in Florida.

Perez's counsel asked the VE whether a claimant could perform Perez's past relevant work, if she had the same vocational background as Perez and the limitations identified in Dr. Hasbun or Dr. Mendez-Villamil's assessments. The VE stated such a claimant with either set of limitations would be unable to perform Perez's past relevant work or any other jobs that exist in significant numbers in the national economy. As an event worker, Perez earned $421.75 in 2004, and $391.19 in 2005. The record contains no evidence of event-worker earnings from any other years.

## C.    ALJ and Appeals Council's Decisions

The ALJ concluded Perez had not been under a disability since June 24, 2010, the date on which she filed her application for SSI. The ALJ determined Perez had not engaged in substantial gainful activity since that date. The ALJ found Perez suffered from the following severe impairments: status post-stroke, hypertension, major depressive disorder, and anxiety disorder. In discussing Perez's severe impairments, the ALJ did not mention her multiple myeloma. The ALJ determined Perez did not have an impairment or combination of impairments that met or medically equaled the severity of those listed in 20 C.F.R. Part 404,

13

Subpart P, Appendix 1.  Specifically, the examining consulting psychologist, Dr. Miro, reported Perez had no more than mild restrictions in her activities of daily living, because she testified her children helped her with housework, but she reported being independent in self-care, including grooming, dressing, bathing, and eating.  Additionally, the ALJ noted Perez reported to the state agency she was able to clean around the house, cook, drive her ten-year-old daughter to and from school, and oversee her daughter's homework.  Perez had no more than moderate difficulties with social functioning; although she testified she had no social life, she reported to the state agency she lived with her children and reported no difficulties with that arrangement.  Additionally, Dr. Mendez-Villamil noted Perez was cooperative, and the ALJ observed Perez interacted appropriately with her counsel, court staff, and the ALJ.

The ALJ determined Perez had moderate difficulties regarding concentration, persistence, or pace.  The ALJ explained Perez's testimony regarding her difficulty concentrating was consistent with Dr. Miro's opinion.  The ALJ noted, however, Perez was able to follow the hearing without perceptible difficulties and to provide meaningful testimony.

The ALJ next determined Perez had the RFC to perform a reduced range of light work, as defined in 20 C.F.R. § 416.967(b).  Because of her psychological problems, however, she could perform only simple, routine, and repetitive tasks.

14

Ultimately, the ALJ found Perez's medically determinable impairments reasonably could be expected to cause her alleged symptoms. Nevertheless, the ALJ determined Perez's statements regarding the persistence, severity, and limiting effects of her impairments were inconsistent with the medical evidence, because she (1) had not been hospitalized or required emergency-room treatment at any time relevant to the ALJ's decision, (2) had not reported any side effects from medication to her treating or examining sources, and (3) was independent in self-care; consequently, her actual functioning evidenced greater abilities than alleged.

The ALJ accorded little weight to the opinion of Perez's treating physician, Dr. Hasbun, that she had very limited physical functioning and explained it was inconsistent with Dr. Hasbun's contemporaneous treatment notes, the opinion of consultative examiner Dr. Meruelo, and the record as a whole. The ALJ emphasized Dr. Meruelo's findings (1) Perez could tandem walk and heel-and-toe walk; (2) her joints appeared normal; (3) her upper extremities were rated at 5/5 strength; and (4) her strength in her lower extremities was 4+/5 and 1+/5.

The ALJ accorded considerable weight to Dr. Meruelo's opinion Perez had no impairment of either ambulation or dexterity, given Dr. Meruelo's physical findings and Perez's history, symptomatology, ambulation, and dexterity. The ALJ explained Dr. Meruelo's opinion was consistent with the record medical evidence. In deference to Perez's subjective complaints, however, the ALJ limited

15

Perez's physical functioning to the exertional demands of light work.  Likewise, the ALJ accorded considerable weight to agency reviewer Marta Sanchez, to whom the ALJ referenced as a "reviewing physician," because Sanchez's opinion Perez retained the ability to perform the physical demands of light work, afforded "sufficient weight" to Perez's subjective complaints about pain.  R. at 63.

The ALJ accorded little weight to the opinion of treating psychiatrist, Dr. Mendez-Villamil, that Perez had no more than a poor ability to perform most mental work-related functioning.  The ALJ explained: "While I find that Dr. Mendez-Villamil's opinion was inconsistent with his treatment notes, I find that his treatment notes are scant and rely entirely upon a form of check boxes which generally indicate that [Perez] was cooperative, had fair eye contact, was oriented [and] had no delusions, or compulsions."  R. at 63.  Additionally, the ALJ found Dr. Mendez-Villamil's opinion was inconsistent with Perez's actual functioning.

The ALJ accorded considerable weight to Dr. Miro's opinion Perez was likely to experience limitations in carrying out complex instructions and achieving satisfactory work performance.  The ALJ explained Dr. Miro's opinion was consistent with the record as a whole and with Perez's overall functioning.  The ALJ also accorded considerable weight to the opinion of consulting psychologist,

16

Dr. Nunez, that Perez retained the ability to manage her finances and function in a work-like setting, because it was consistent with the record medical evidence.

Relying on the VE's testimony, the ALJ determined Perez was capable of performing her "past relevant work" as an event worker, because it did not require the performance of work-related activities precluded by her RFC. R. at 64. The ALJ did not make specific findings about Perez's ability to perform other work. Perez sought review by the Appeals Council of the ALJ's decision. The Appeals Council denied the request, which made the ALJ's decision the final decision of the Commissioner of Social Security ("the Commissioner").

D.    Proceedings in District Court

In proceedings before the district judge, Perez and the Commissioner each moved for summary judgment. Perez argued the ALJ erred in considering her event-worker job to be past relevant work, because her earnings from that job were minimal. A magistrate judge issued a Report and Recommendation ("R&R"), recommending summary judgment for the Commissioner. The magistrate judge explained any error in treating Perez's event-worker job as past-relevant work was harmless, because of the VE's testimony Perez could perform other work available in significant numbers in the national economy. The district judge adopted the R&R over Perez's objections and granted summary judgment to the Commissioner.

## II.    DISCUSSION

A.    <u>Review Standards for Treating Physicians and Reviewing State Agency</u>

Perez argues the ALJ failed to identify valid reasons for discounting the weight of the opinions of treating physicians, Dr. Mendez-Villamil and Dr. Hasbun.  Instead, the ALJ gave conclusory statements regarding alleged inconsistencies between their treatment notes and assessments without identifying any inconsistencies.  Additionally, Perez argues the ALJ improperly accorded greater weight to the opinions of Sanchez, a state agency, non-examining reviewer.

We review the Commissioner's decision to determine if it is supported by substantial evidence and based on proper legal standards.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Substantial evidence is "more than a scintilla" and is relevant evidence a reasonable person would accept as adequate to support a conclusion.  *Id.* (internal quotation marks omitted).  We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner.  *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014).  Even if the evidence preponderates against the Commissioner's factual findings, we must affirm if substantial evidence supports the decision.  *Crawford*, 363 F.3d at 1158-59.

"It is well-established that the testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the

18

contrary." *Id.* at 1159 (internal quotation marks omitted). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). The ALJ clearly must articulate reasons when electing to disregard the opinion of a treating physician. *Id.*

In *Moore v. Barnhart*, the ALJ discredited the testimony Moore's treating chiropractor, Dr. Pardo, about Moore's fibromyalgia. 405 F.3d 1208, 1210, 1212 (11th Cir. 2005). Dr. Pardo, who had treated Moore for approximately six months, opined Moore was unable to work indefinitely. *Id.* at 1212. The ALJ found this opinion deficient, because (1) Dr. Pardo failed to account for Moore's diverse daily activities; (2) Dr. Pardo failed to give any specific assessment of Moore's functional capacity or explain how it bore on the conclusion Moore could not work; and (3) Dr. Pardo's opinion was prepared on a short form used to support Moore's food-stamp eligibility. *Id.* As to that particular determination by the ALJ, we explained as follows: "Where our limited review precludes re-weighing the evidence anew, and as the ALJ articulated specific reasons for failing to give Dr. Pardo's opinion controlling weight, we find no reversible error." *Id.* (citation omitted).

19

In *Lewis v. Callahan*, however, we concluded the ALJ lacked "'good cause'" to credit the opinions of non-treating consulting physicians over the opinion of the claimant's treating physician. 125 F.3d 1436, 1440 (11th Cir. 1997). The claimant, Lewis, had suffered a heart attack and was diagnosed with unstable angina, atherosclerotic heart disease, and ventricular tachycardia. *Id.* at 1437. Lewis's treating cardiologist, Dr. Anderson, opined on Lewis's functional capacity and stated, though Lewis had improved somewhat after quintuple bypass surgery, in view of his "'documented cardiac problems . . . he should qualify for disability and be declared completely disabled.'" *Id.* at 1437-38. Lewis's general practitioner, Dr. Timberlake, similarly opined Lewis was "severely disabled with a *large ventricular aneurysm* in his heart and severe coronary artery disease." *Id.* at 1438 (alteration omitted). Two consulting physicians, neither of whom were cardiologists, also examined Lewis. *See id.* at 1438, 1440. The first, Dr. Fitz-Gerald, acknowledged Lewis's history of coronary artery and hypertensive cardiovascular disease but opined Lewis could sit, stand, and walk for eight hours at a time. *Id.* at 1438. The second, Dr. Singleton, also acknowledged Lewis's history of heart disease and high-blood pressure but opined Lewis could (1) sit for four hours at one time or six hours during the day, and (2) stand or walk for two hours at one time or four hours during the day. *Id.*

The ALJ gave three reasons for crediting the opinions of the consulting physicians over those of Lewis's treating physicians; we rejected all of them. *See id.* at 1440-41. First, the ALJ determined Dr. Timberlake's conclusions regarding Lewis's heart were not entitled to greater weight than other medical evidence, because he was not Lewis's treating cardiologist. *Id.* at 1440. We explained (1) "[t]he ALJ failed to mention that this conclusion applies with equal force to the conclusions of Dr. Fitz-Gerald and Dr. Singleton," and (2) the ALJ's rationale actually bolstered Dr. Anderson's credibility as the only examining specialist. *Id.* at 1440-41.

Second, the ALJ rejected Dr. Anderson's assessment, which found Lewis could no longer work as a longshoreman, but did not report Lewis was unable to perform "*any* job." *Id.* at 1441. We explained Dr. Anderson's omission was of ambiguous significance, because he also concluded Lewis was "'completely disabled.'" *Id.* Third, the ALJ determined other objective medical evidence, (1) a six-minute graded exercise test on a treadmill, and (2) participation in everyday activities of short duration, such as housework and fishing, did not support the opinions of Lewis's treating physicians. *Id.* We explained that rationale was insufficient, because the six-minute exercise was not necessarily indicative of an ability to work, and Lewis's participation in everyday activities of short duration was not inconsistent with the limitations found by his treating doctors. *Id.*

21

In this case, substantial evidence does not support the ALJ's decision to accord little weight to Perez's treating physicians and greater weight to the opinions of the consulting sources. Our analysis consists of three parts. First, we analyze the reasons the ALJ gave for according little weight to Dr. Hasbun's opinion; second, we discuss the reasons the ALJ gave for according little weight to Dr. Mendez-Villamil's opinion; and third, we consider the weight accorded to Sanchez's opinion.

### 1.    Dr. Hasbun's Opinion

The ALJ gave two reasons for according Dr. Hasbun's opinion little weight; both were insufficient. First, the ALJ stated Dr. Hasbun's opinion about Perez's limitations contradicted Dr. Hasbun's own contemporaneous treatment notes; however, this statement was conclusory, because the ALJ did not identify any contradictions. The ALJ listed several medical findings after making this statement, but those findings all came from consulting the report of the examining physician, Dr. Meruelo. To the extent the ALJ relied upon a purported contradiction between Dr. Hasbun's treatment notes and assessment of Perez's abilities, the explanation is insufficient. *See Phillips*, 357 F.3d at 1241.

The ALJ's second reason for according Dr. Hasbun's opinion little weight was the record as a whole was inconsistent with it, which is insufficient for three reasons. First, in stating the record as a whole contradicted Dr. Hasbun's opinion,

22

the ALJ referred only to a discrete portion of the record, Dr. Meruelo's assessment. *See Lewis*, 125 F.3d at 1440-41.  Second, the medical findings from Dr. Meruelo's report do not contradict Dr. Hasbun's opinion regarding Perez's functional limitations.  Specifically, the ALJ cited Dr. Meruelo's conclusions (1) Perez had no impairment to her ambulation or dexterity; (2) she could tandem and heel-to-toe walk; (3) her joints were normal; and (4) she had 5/5 strength in her arms, and 4+/5 and 1+/5 strength in her lower extremities.  None of these conclusions directly contradicts Perez's inability to lift 10 pounds or to walk or sit for more than an hour in a workday or any other limitations Dr. Hasbun found to exist.  *See id.* at 1441.  Third, portions of Dr. Hasbun's treatment notes contradict Dr. Meruelo's findings, and the ALJ failed to address this fact in giving Dr. Meruelo's assessment greater weight.  *See id.* at 1440-41.  For example, Dr. Hasbun's repeated findings Perez had difficulty walking and a limited range of motion in her extremities contradict Dr. Meruelo's finding Perez had no impairment to ambulation or dexterity.

　　2.　　Dr. Mendez-Villamil's Opinion

Similarly, the ALJ gave specific reasons for according little weight to Dr. Mendez-Villamil's opinion Perez had little to no ability to perform most mental work-related functioning, but the opinion was inconsistent with (1) his treatment notes, and (2) Perez's actual functioning.  In explaining the first reason,

23

the ALJ emphasized Dr. Mendez-Villamil's treatment notes showed Perez was cooperative, had good eye contact, and had no delusions or compulsions. These findings, however, do not contradict Dr. Mendez-Villamil's ultimate conclusion, concerning Perez's inability to function in a work setting. *See id.* at 1441.

The ALJ's second reason, Dr. Mendez-Villamil's opinion contradicted Perez's actual functioning, does not constitute substantial evidence in support of the decision to give little weight to Dr. Mendez-Villamil's assessment. *See id.* The ALJ found Perez (1) reported being independent in self-care, including grooming, dressing, bathing, and eating, (2) sometimes cooked and cleaned at home, and (3) oversaw her daughter's homework. During the hearing, the ALJ observed Perez interacted appropriately with her counsel, court staff, and the ALJ. As we noted in *Lewis*, however, Perez's ability to perform everyday activities for a short duration is not necessarily inconsistent with Dr. Mendez-Villamil's assessment of her overall inability to function in a work setting. *See id.*

### 3.    Sanchez's Opinion

In addition to "acceptable medical sources," which include licensed physicians and psychologists, an ALJ also may use evidence from other sources to determine the severity of a claimant's impairments and how they affect her ability to work. 20 C.F.R. § 416.913(a), (d). The "other sources" referenced in § 416.913(d) include "[m]edical sources not listed in [§ 416.913(a)] (for example,

24

nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)." *Id.* § 416.913(d)(1).

The ALJ incorrectly referred to Sanchez as a reviewing physician and accorded her opinion considerable weight. The ALJ was permitted to consider Sanchez's opinion because it was an acceptable "other source." *See id.* § 416.913(a), (d). Nevertheless, the ALJ erred in according Sanchez's Physical RFC Assessment considerable weight, because (1) Sanchez's assessment contradicts Dr. Hasbun's opinions regarding Perez's functional limitations, and (2) the ALJ gave insufficient reasons to establish good cause to give Dr. Hasbun's opinion less than substantial weight. *See id.* § 416.913(a); *Phillips*, 357 F.3d at 1241. Consequently, substantial evidence did not support the ALJ's decision to accord (1) less than substantial weight to the opinions of Dr. Hasbun and Dr. Mendez-Villamil or (2) considerable weight to the opinions of state agency non-examining reviewer, Sanchez.

B.    Perez's Multiple-Myeloma Impairment

Perez argues the ALJ improperly failed to find her multiple myeloma constituted a severe impairment under the regulations. She argues the ALJ should have recognized it as severe, because of Dr. Hasbun's repeated diagnosis, referrals to an oncologist, and findings she suffered generalized pain resulting from the malady.

In evaluating whether a claimant is "disabled" for purposes of SSI, an ALJ uses a five-step process and analyzes whether the individual (1) is performing substantial gainful activity, (2) has a severe impairment or combination of impairments (3) that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) can perform her past relevant work, and (5) based on her age, education, and work experience, can perform other work of the sort found in the national economy.  20 C.F.R. § 416.920(a)(4); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  If the ALJ determines none of the claimant's impairments, alone or in combination, is medically severe, the ALJ must conclude the claimant is not disabled.  *McDaniel*, 800 F.2d at 1030-31 (citing 20 C.F.R. § 416.920(c)).  If the ALJ concludes the claimant's impairments are medically severe, then the ALJ proceeds to the third step.  *See id.*  The claimant bears the burden of proving she has a severe impairment or combination of impairments. *See id.* at 1030.  An impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's physical or mental ability to work, irrespective of age, education, or work experience.  *See Bridges v. Bowen*, 815 F.2d 622, 625-26 (11th Cir. 1987).

26

Perez has shown nothing in the record indicating her multiple myeloma has had any effect on her ability to work.  Therefore, she has not shown the ALJ erred in failing to find it was a severe impairment.  *See id.*; *McDaniel*, 800 F.2d at 1030.

C.    ALJ's Discrediting Perez's Testimony Regarding the Effects of Her Impairments

Perez argues substantial weight does not support the ALJ's decision to discredit her subjective testimony regarding the severity of her impairments.  A claimant becomes eligible for SSI, when she is disabled and has filed an application for SSI benefits.  20 C.F.R. § 416.202(a), (g); *see also Moore*, 405 F.3d at 1211 ("For SSI claims, a claimant becomes eligible in the first month where she is both disabled and has an SSI application on file.").  An SSI appellant must show she was disabled between the date on which she applied for SSI and the date of the ALJ's decision.  *Moore*, 405 F.3d at 1211.

When a claimant attempts to show disability through her own testimony about pain or other subjective symptoms, the ALJ must consider that testimony if the ALJ finds evidence of an underlying medical condition and either (1) objective medical evidence to confirm the severity of the alleged symptoms arising from that condition, or (2) the objectively determined medical condition is of a severity that reasonably can be expected to give rise to the alleged symptoms.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  If the claimant establishes an underlying medical condition that reasonably could be expected to produce the symptoms, "all

27

evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Id.* at 1561.

If the ALJ decides not to credit a claimant's testimony regarding her subjective symptoms, she must state "explicit and adequate reasons for doing so." *Id.* at 1561-62. Failure to state the reasons for discrediting subjective symptom testimony "requires, as a matter of law, that the testimony be accepted as true." *Id.* at 1562. We will not disturb "[a] clearly articulated credibility finding with substantial supporting evidence in the record." *Id.*

In form, the ALJ complied with the requirements set forth in *Foote*; however, the ALJ's reasoning is not supported by substantial evidence. *See id.* at 1561-62. First, the ALJ determined Perez had medically determinable impairments that reasonably could be expected to cause her alleged symptoms. *See id.* at 1560. Nevertheless, the ALJ concluded the evidence contradicted Perez's testimony about the extent of her impairments for three reasons: (1) she had not been hospitalized or required emergency-room treatment at any time relevant to the decision; (2) she exhibited independence in self-care; and (3) she had not reported any side-effects from medication to her treating or examining sources. *See id.* at 1560-62. Substantial evidence does not support the ALJ's conclusion, because (1) the ALJ accorded insufficient weight to the opinions of Dr.

28

Hasbun and Dr. Mendez-Villamil, and (2) those opinions call into question the ALJ's determination Perez's testimony about her symptoms was exaggerated. On remand, the ALJ also should consider Perez's hospitalizations and reports of side-effects from medications. Because these events occurred in the months immediately preceding Perez's SSI application, they are pertinent to the question of whether she was disabled during the relevant time period. *See* 20 C.F.R. § 416.929(c)(1)-(2) (providing the ALJ must consider all objective medical evidence in the record).

D.    ALJ's Assessment of Perez's RFC

Perez argues substantial evidence does not support the ALJ's RFC assessment, because the ALJ failed to take into account all the limitations from her impairments and to weigh properly her treating doctors' opinions. At the fourth step in the analysis of an SSI case, the ALJ assesses the claimant's RFC. *Id.* § 416.920(a)(4)(iv). The regulations define RFC as that which the individual is still able to do despite limitations caused by her impairments. *Id.* § 416.945(a). The ALJ makes the RFC determination based on all relevant medical and other evidence in the case. *Id.* § 416.920(e). "That is, the ALJ must determine if the claimant is limited to a particular work level." *Phillips*, 357 F.3d at 1241 (addressing RFC under the Social Security disability insurance regulations). The applicable regulations define "light work" as "work [that] involves lifting no more

29

than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). Jobs in the "light work" category require "a good deal of walking or standing," or "sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

The ALJ's RFC assessment contradicts the opinions of Perez's treating doctors concerning her functional limitations. For example, the ALJ determined Perez could perform light work, which involves frequently lifting or carrying objects weighing up to 10 pounds. *See id.* § 416.967(b). But Dr. Hasbun opined Perez was unable to lift or carry objects weighing 10 pounds. Because substantial evidence does not support the ALJ's decision to accord less than substantial weight to the opinions of Perez's treating doctors regarding Perez's functional limitations, substantial evidence also does not support the ALJ's corollary RFC assessment.

E.    Perez's Past Relevant Work

Perez argues the ALJ also erred in determining her work as an event worker constituted past relevant work, because her earnings were minimal. Consequently, the ALJ's finding she could perform her past relevant work was erroneous. "Past relevant work" means work the claimant has performed "within the past 15 years, that was substantial gainful activity." *Id.* § 416.960(b)(1). Whether work constitutes substantial gainful activity is primarily determined through the claimant's earnings. *Id.* § 416.974(a)(1). A claimant's earnings show she was

30

engaged in substantial activity, if they average more than the larger of (1) the amount for the previous year, or (2) $810 per month for 2004 and $830 per month for 2005. *See id.* § 416.974(b)(2)(ii).[2]

Perez's event-worker job was not past relevant work, because the wages she earned from that job, $421.75 in 2004 and $391.19 in 2005, did not rise to the level required for substantial gainful activity. *See id.* This error was not harmless, because substantial evidence does not support the ALJ's RFC assessment. Accordingly, the district judge on remand should instruct the ALJ to reassess Perez's past relevant work appropriately.

### III.    CONCLUSION

The ALJ did not err in failing to consider Perez's multiple myeloma to be a severe impairment at step two of the analysis. Nevertheless, substantial evidence does not support (1) the ALJ's decision to accord little weight to the opinions of Perez's treating physician and psychiatrist relative to those of the consulting sources; (2) the reasons underlying the ALJ's decision to discount Perez's testimony about the persistence and severity of her symptoms; and (3) the ALJ's RFC determination. Moreover, the ALJ erred in considering Perez's event-worker job to be past relevant work experience. Accordingly, we reverse the district

---

[2] Section 416.974(b)(2)(ii) establishes the formula for calculating the average monthly figure using the national average wage index. The Commissioner has published a table showing those calculations. *See* http://www.socialsecurity.gov/oact/cola/sga.html.

judge's granting summary judgment to the Commissioner and remand with

instructions to remand the case to the Commissioner for further proceedings

consistent with this opinion.

**REVERSED AND REMANDED.**